[Crim. No. 4870.   In Bank.    Sept. 7, 1948.]

THE PEOPLE, Respondent, v. LOUIS ORCALLES,
Appellant.

Adon V. Panattoni and John H. Paine for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant, Louis Orcalles, was charged with the murder of Benny Padilla and with assaulting Nick Gundran with a deadly weapon with intent to commit murder. He pleaded not guilty and not guilty by reason of insanity. A jury found him guilty of murder of the first degree and imposed the death penalty. They failed to return a verdict on the count which charged the crime of assault and on motion of the People such count was dismissed. The issue raised by defendant's plea of not guilty by reason of insanity was then tried before the same jury and they found that he was sane

at the time of the homicide. His motion for new trial was denied. On this appeal he complains of certain errors which occurred on the trial of the issues raised by his plea of not guilty. We have concluded, after examination of the entire cause, that by virtue of these errors defendant was not afforded a proper trial of the questions of the degree of the murder and of the penalty to be imposed.

Defendant had been acquainted with his victims for approximately two years before August 17, 1947, the date of the homicide. In July, 1947, defendant met Phyllis Padilla. Phyllis was the wife of Benny Padilla but was separated from him and was living with Nick Gundran as the latter's wife. On August 4, defendant began "going with" Phyllis, and she and Nick "broke up." Defendant and Phyllis thereafter discussed the possibility of her obtaining a divorce from Benny and about August 12 defendant bought her a wedding ring. On the evening of August 16, defendant encountered Benny and Nick on the street. Defendant said, "I want to smooth things, Benny, and I don't want any trouble at all. . . . Please forgive me as you have forgiven Nicky." Benny replied, "You are like a dog. . . . If I will see you going with my wife I don't know what I am going to do with you." Benny then "called Ramon Rivera to help him . . . threaten [defendant]. . . . When Ramon came Benny grabbed" defendant's tie. Defendant freed himself from Benny's grasp. Benny "run for his car"; Ramon told defendant "to run" and defendant "knew then that he [Benny] goes up there for a knife or a gun"; defendant, not wanting trouble and having no weapon at hand, ran away.

The next morning, August 17, defendant called upon Phyllis. According to his testimony, "I told her that I am not going to take her to [a christening party which they had planned to attend on the afternoon of the 17th, because] . . . 'Your husband warn me that if I even go with you and see you any place any time he would do something.' . . . I told her that I am going to the party, but I am not going there to look for trouble. . . . I told her that in case they tried to threaten me in the party and I get cornered then I will have to do something to protect my life." Defendant left Phyllis and went to the ranch where he had been employed in order to get his hunting knife. He armed himself with the hunting knife, which he placed on his left side between his shirt and his trousers (as well as with a pocket spring knife which he carried, as he often did, in his right pocket) because "I felt

more secure with it because they [Benny and Nick] were threaten my life—to lessen my fear for them."

In the afternoon of August 17, defendant attended the christening party. At about 4 p.m., while he was in the dance hall, Benny and Nick arrived, stood at a distance from defendant, talked together, and looked at defendant in an "unfriendly" manner. During the next two hours they did not approach or speak to defendant. At about 6 p.m., when defendant left the hall where the party was in progress, he met Nick and Benny. They stood with their hands in their pockets and closely watched defendant, particularly his right pocket. Defendant admitted that neither Nick nor Benny made any threatening move or spoke any abusive or threatening words, except that Benny said in a "very rough voice . . . that I was looking for trouble. . . . I was scared and confused . . . Everything went dark." Without saying a word defendant "came immediately stabbing." He stabbed Benny twice with the hunting knife, then stabbed Nick twice. Nick fled and defendant pursued him. Defendant stumbled and fell. A crowd of guests had come from the hall. One of them took defendant's hunting knife from him. Defendant got up, returned to the place where Benny had fallen, took out his spring knife, and stabbed Benny approximately 30 times, saying, "I am veteran; I am not afraid to kill people. I kill lots of Japs, and I am not afraid." According to the autopsy surgeon, "several" of the stab wounds "could have produced death but one in particular [which punctured the aorta] . . . is the immediate cause of death." Defendant then cut off the nose and ears of Padilla. He ordered a bottle of beer, drank part of it, poured part of it on Benny's mouth, and said, "This is a toast on you." Defendant testified as follows in explanation of this conduct: "I thought I was fighting the Japs. . . . I drink the beer, part of the beer, and pour part of it to Benny's mouth and I said, 'This is a toast on you.' I should have said, 'Son of Hirohito,' but I realized then that he was not a Jap. . . . I did practically the same thing to a Jap that I killed in New Guinea. I cut the Jap's nose and ears with the intention of keeping it for a souvenir, but my squad leader told me not to do so.")

According to one Murial Abrescy, a guest at the party, immediately after the killing defendant approached her, showed her his bloody hands, said "that he killed Benny because the day before . . . they were after him, so before they could get him he killed them"; defendant also showed her a picture of

Phyllis which he carried in his wallet. Thereafter he waited quietly until police officers arrived and placed him under arrest.

In the evening after his arrest defendant said, when an officer told him that "Nick Gundran was in bad shape," that he hoped that Nick would die. He was then asked, "Did you really intend to kill both these men?" and replied, "I did." Later that evening at an interview with a deputy district attorney defendant thus described the killing: "they [Nick and Benny] say, 'I think you are looking for trouble,' and so I didn't wait, I just give them all they deserve. . . . [T]hey get hands like that in pocket. (Indicating) . . . I . . . don't know if they had anything in their pockets . . . but I don't want to take chance, because two men against one. . . . I stabbed him [Benny] many times . . . I want to make sure he is dead." Defendant was asked, "When did you decide to kill him?" and replied, "I ain't got no decision to kill him unless he was trying to start something." He was asked, "Are you glad he is out of the way now?" and answered, "Yes, because I kill him I have nothing to worry about being on the spot because I can't sleep when in danger. I know I am in danger because he warn me, he said, 'If I see you with my wife.'"

It is clear from the above summarized evidence that the triers of fact could rationally have found that defendant, even before he went to the christening party, had premeditated and formed a deliberate and fixed intention to kill; but they might also very reasonably have found that defendant's original intention, which he endeavored to express to Phyllis on the morning of the killing, was neither to avoid nor to seek out Nick and Benny, but to be prepared to defend himself if they should attack him, and that the actual killing was done in anger and terror which would render the crime murder of the second, rather than of the first, degree. The answers which the defendant made, shortly after the homicide, to questions addressed to him by investigating and prosecuting officers, as related by these officers, indicate naïveté in recounting the facts, subjective as well as objective, and inartificiality in his use of the English language. The entire record establishes, with no substantial contradiction, that defendant's account of the quarrel with Nick and Benny, and of the stabbings, is in the main true; it also suggests that defendant was not an experienced criminal, wise in the niceties of the law of homi-

cide but, rather, that he was a veteran of war, trained and experienced in legal killing in defense of his country.

The jury in their determination of the degree of the offense and the imposition of penalty were guided by correct instructions.[1] But by virtue of misconduct of the prosecuting attorney, accentuated rather than corrected by the trial court, it is impossible to determine whether the finding as to the degree of the homicide was based on improperly admitted evidence and improper inferences from questions asked and comments made by the prosecuting attorney, and whether the death penalty was arrived at by the jury in the exercise of a sound discretion based upon the facts of the case or was inflicted because of passion aroused by such misconduct.

Phyllis Padilla, during the two months between the date of the killing and the time of trial, was under the con-

---

[1]As to fixing the penalty they were told,

"It is provided by the law of this state that every person convicted of murder of the first degree shall suffer death or confinement in the state prison for life at the discretion of the jury trying the same. You will observe, therefore, that if you find from all the evidence in the case to a moral certainty and beyond a reasonable doubt that the defendant is guilty of murder . . . of the first degree, then, upon such finding, the discretion is vested in you of determining, and it is your duty to determine what the punishment shall be, namely, whether the defendant found guilty of murder of the first degree shall be punished by death or imprisonment for life. . . .

"If you should find the defendant guilty of the crime of murder of the first degree, as charged in the Information, then it is for you, in your discretion, to fix the punishment as I have explained to you, that is to say, whether or not such defendant whom you have found guilty of murder of the first degree, shall suffer death or confinement in the State Prison for life, and in fixing such punishment, it is your right and duty to consider and weigh all the facts and circumstances attending the commission of the alleged offenses, and from these and such reasons as may appear to you upon consideration of the whole situation, to determine whether in the exercise of your discretion life imprisonment or the death penalty shall be imposed. If in the exercise of such discretion you decide that the defendant should suffer death, the form of your verdict in such case should be:

" 'We, the Jury in the above entitled cause, find the Defendant, guilty of the crime of Murder, as charged in the Information of the first degree and fix the penalty of death.'

"However, before you can return such verdict, all twelve of you must fix the penalty at death. But if, on the other hand, in the exercise of such discretion you fix the punishment at confinement in the State Prison for life, then you will specify the same in your verdict, and the form of verdict in such case should be:

" 'We, the Jury in the above entitled cause, find the Defendant, guilty of the crime of Murder, as charged in the Information, of the first degree and fix the punishment at imprisonment in the State Prison for the term of his natural life.'

"However, before you can return such verdict, all twelve of you must fix the penalty at life imprisonment."

trol of the People, held in jail as a material witness. She testified briefly as a prosecution witness, merely identifying pictures of the deceased as being of her husband. As a defense witness she testified concerning the relations among herself, defendant, Benny and Nick. During his cross-examination of Phyllis the prosecuting attorney asked, "Didn't Louis Orcalles [on the morning of August 17] come over to your house and tell you he was going to kill your husband?" Phyllis testified, "No, he told me . . . that if Benny ever drew a knife on him something would happen, but he did not say he would kill him or anything like that." Thereupon the prosecuting attorney laid the usual foundation for introduction of evidence of a prior contradictory statement. He asked whether the witness recalled a conversation on August 22, 1947, with two deputy district attorneys. Phyllis replied that she did. The prosecuting attorney then produced a transcript of shorthand notes of the conversation, and proceeded to ask Phyllis at some length (28 pages of the Reporter's Transcript) whether she had made certain statements which he read or paraphrased from the transcript. He repeatedly asked whether Phyllis had said to the deputy district attorneys that defendant "had told you he was going to kill Benny." The following excerpts from the reporter's transcript typify her examination on this subject: "No. . . . I don't remember that I made it [the statement] like that. . . . I didn't say he would kill him . . . I don't think I did. I am pretty sure I didn't. THE COURT: . . . did he tell you he was going to kill him? A. No. . . . MR. SCALORA [prosecuting attorney]: Q. You say that Louis Orcalles did not tell that to you, is that correct? A. He told me like I told you a while ago that if Benny ever drew a knife on him, that something would happen, but that is all . . . I didn't say [to the deputy district attorneys] he was going to kill him. . . . I just don't remember. . . . Q. What did Louis tell you he was going to kill Benny if he did what? . . . A. He didn't tell me he was going to kill him. That morning he told me if Benny drew a knife on me something would happen, but he didn't say he was going to kill him. . . . I don't remember saying that Louis said he would kill Benny in any part of that. I don't remember saying he would . . . Q. What was the plan that you had with Louis? Was it to kill Benny? A. We didn't have a plan. Q. But, you discussed the fact with Louis about killing Benny, didn't you? A. No, we didn't. . . . Q. You deny now that you ever discussed with Louis Orcalles the

question of killing your husband? A. We never discussed that, no. ...."

Thereafter the People introduced evidence that on August 22 Phyllis had said to the deputy district attorneys that defendant "told me he was going to kill Benny if Benny pulled a knife on him." We may assume for the purposes of this discussion that the procedure was proper for the purpose of impeachment. However, in his closing argument the prosecuting attorney said, "Now, don't forget, Louis Orcalles, on the morning before the killing, went to see the wife of the deceased and told her, 'I am going to kill Benny.'" Defendant's counsel pointed out that there was no competent evidence of the fact that defendant had made such statement. The trial court, instead of clearly explaining to the jury the purpose of admitting evidence of Phyllis' asserted statement of August 22, made the inadequate and inaccurate statement, "The jury will understand that you are the judges of the evidence . . . you are the ones who are to determine what evidence has been presented."

In two other respects the People's use of evidence of Phyllis' asserted statements of August 22 was improper. She was asked whether on August 22 she had said that on the day of the homicide she "had a feeling" that defendant would kill Benny. She denied using the word "kill." The trial court erroneously overruled defendant's objection and denied his motion to strike, made on the ground that "the feeling as described in that statement has no relevancy to this matter whatsoever," and the People were allowed to introduce in evidence the portion of an asserted statement tending to prove that on August 22 she had said that on the day of the homicide she had had a "feeling . . . [t]hat Louis would kill Benny." In closing argument the People referred to and relied on this evidence and the trial court, in response to the request of defendant's counsel that the jury "be instructed that this statement was admitted merely for purposes of impeachment and is not evidence of the truth of the facts stated outside of this courtroom," gave the inadequate instruction, "The Jury will understand that they are the sole judges of all the evidence admitted in this case." The fact that Phyllis after the killing made an extrajudicial statement that prior to the killing she had a "feeling" that it would occur, is not competent evidence of any issue in the case and such fact should

not have been used as "evidence" by the People or referred to and relied upon in argument.

The People were also allowed, on cross-examination of Phyllis, over repeated and proper objection, to question her as to the following matter:

"Q. Now, in the conversation on Friday, August 22d, in which you were questioned by Mr. Mundt and Mr. Williamson in the District Attorney's office, did you tell Mr. Mundt and Mr. Williamson that your husband never had a chance on August 17, 1947?

"MR. PANATTONI [defendant's counsel]: I object to that and cite it as prejudicial. This defendant wasn't there and this is an attempt to introduce that before the Jury improperly and it is highly prejudicial.

"THE COURT: Overruled.

"MR. SCALORA [prosecuting attorney]: Did you tell Mr. Mundt and Mr. Williamson that you didn't think Benny ever had a chance on that deal on August 17, 1947?

"MR. PANATTONI: That is again objected to on the same grounds.

"THE COURT: Objection overruled to the admissibility of this line of testimony, but sustained to the particular form of this particular question. . . .

"MR. SCALORA: Q. In relation to the conversation you had with Louis Orcalles concerning what he has said to you, did you in relation to those facts express to Mr. Mundt that in your opinion your husband, Benny, didn't have a chance?

"MR. PANATTONI: I object to it on the same grounds.

"THE COURT: Overrule the objection. Why don't you present the questions and answers, if you are referring to this conversation? Ask her if she said these things. You are getting a lot of conclusions in there. Ask her if she said these things. This all dates back as to whether or not she told Mr. Mundt and Mr. Williamson that he said he was going to kill the deceased. That is the only reason why it is admissible. . . .

"MR. SCALORA: . . . Q. Were you asked this question: 'Question: I don't think Benny ever had a chance in this deal. Answer: No, I don't either.'

"MR. PANATTONI: I cite this as prejudicial misconduct. It purports to be a statement of an opinion and conclusion of the witness which has no bearing in this matter.

"THE COURT: It all goes back to her testimony.

"MR. PANATTONI: That is not the purpose. It is only or

would only be admissible for impeachment, and there is no impeachment here.

"THE COURT: Overruled.

"MR. SCALORA: Q. Were you asked that question in that conversation, and did you give that answer?

"WITNESS: Read it again.

"Q. 'Question: I don't think Benny ever had a chance in this deal. Answer: No, I don't either.' Do you remember saying that? . . .

"THE COURT: I don't know what you can interpret that to mean.

"MR. SCALORA: Well, following that were you asked this question: 'Question: I don't think he had a thing with which to defend himself. Answer: He had the baby with him too.'

"A. I was told he had the baby with him when he died. That's all I know,—and I told him that.

"MR. PANATTONI: I object to this line. It isn't by way of impeachment. It is trying to put something in here indirectly which is objectionable. This testimony is all irrelevant, immaterial and prejudicial.

"MR. SCALORA: This witness has given testimony in this case.

"THE COURT: Proceed.

"MR. SCALORA: Q. 'Answer: He had the baby with him too.' You gave that answer in that conversation?

"A. No, I didn't tell him that the girls told me the baby was there.

"Q. Do you deny that you were asked that question and gave that answer?

"A. No, I answered it like that.

"Q. What did you mean by your answer that you didn't think 'Benny ever had a chance.'

"A. I didn't know because I wasn't there, only what the girls came up and told me outside, and that was in the County Jail.

"MR. PANATTONI: And I move to strike all the testimony of this witness as to this particular matter as incompetent, irrelevant and immaterial; hearsay. Cite it as prejudicial.

"THE COURT: I think I will grant the motion. All the testimony with regard to this witness stating that she didn't think Benny had a chance will be stricken from the record, and the jurors are instructed to disregard it. You asked her

why and she told you that somebody else told her that; she didn't know."

The People's efforts to introduce this evidence were highly improper. Its only possible purpose could be to prejudice the jury against the defendant. It had already been established that Phyllis was not at the christening party and therefore could not testify as to the circumstances of the killing. A criminal prosecution should not be defiled to the status of a sordid game in which the People attempt by trick and device to get inadmissible, prejudicial evidence before the jury. Striking out a portion of the wrongfully admitted evidence and instructing the jury to disregard that portion stricken out, as shown above, is not likely, in a case such as this, to repair the damage done.

The erroneous use of evidence above discussed is not explainable as an occurrence in the heat of trial, an unexpected development on cross-examination of a hostile witness. The written record of the extrajudicial statements of Phyllis had long been in the possession of the prosecuting attorneys; it was used deliberately, with full knowledge of its inadmissible contents. The prosecuting lawyer who resorts to such practice is twice answerable: For the honor of his profession as a lawyer; for the integrity of the State in the proceeding he conducts.

Also, there reposed on the trial court a clear duty to be alert to prevent, if reasonably possible, and, if not prevented, to cure, if possible, by prompt and vigorous denouncement and instruction, such misconduct and errors as have been shown. But, as hereinabove shown, the trial court refused to caution the jury as requested by defendant when the prosecuting attorney in argument relied upon the evidence of Phyllis' statements of August 22, and improperly indicated that there was competent evidence that defendant on the morning of the homicide said, "I am going to kill Benny." The court also erroneously refused defendant's requested instruction that "In respect to any attempt to impeach a witness by showing that on some former occasion he made a statement or statements that are contradictory of his testimony here, you are instructed that the evidence of any such contradictory statement is not received for the purpose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness; you are permitted to consider such evidence only for that purpose, and you are the exclusive judges of the effect of such evidence on the witness's credibility" (CALJIC (1946 ed.), Form 54-A); and not only was such proper in-

struction refused but the jury were affirmatively admonished, at the request of the People, that "The degree of passion and provocation and whether malice and premeditation or malice alone, exists in the mind of the slayer or the absence of both . . . are all questions of fact for the jury to determine *from all of the evidence which has been admitted by the Court."* (Italics added.) This last instruction, while it might be entirely proper under other circumstances, serves here to aggravate the error of refusing to limit the applicability of the impeaching evidence.

However reprehensible the conduct of an accused, he is entitled to have its legal consequences determined from competent evidence by a jury properly instructed. Here, we cannot fairly say that, had improper evidence improperly used not been before the jury, unadvised of its impropriety, the verdict and sentence would have been the same.

For the reasons above stated the judgment and order appealed from are reversed.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

EDMONDS, J.—This case was tried on two theories, the proof of either of which would be sufficient to support a verdict of first degree murder. (*People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1].) In reaching its decision, the court has considered but one of these theories, and the determination that the judgment should be reversed is based upon the conduct of the district attorney in connection with testimony presented in proof of premeditation and deliberation in connection with the homicide.

In addition, however, there is evidence that Orcalles cut off the ears and nose of Padilla while the latter was still alive but after several stab wounds, at least one of which later caused death. As to this issue, Orcalles argues that the evidence does not justify a verdict of murder in the first degree as committed in perpetration of mayhem because the acts constituting mayhem followed the infliction of fatal wounds. It follows, therefore, he argues, that the act of mayhem was a mere afterthought, and incidental to the homicide which had been accomplished. Furthermore, says Orcalles, "from the standpoint of logic, ethics, and abstract justice," and the wording of the statute, second degree murder cannot become a more grievous public offense the moment wounds are inflicted on the ears and nose.

But it is the nature of the crime of mayhem which makes the resultant death first degree murder without the need for proof of deliberation or premeditation. The Legislature, by including mayhem among the enumerated felonies of Penal Code, section 189, recognized that the act is a brutal one attributable to a malicious and vicious disposition. If the appellant's contention is correct, the only logical conclusion is that the first blow struck in an affray determines the nature of the crime committed.

Of course, if an act defined as mayhem is committed upon a person after his death, that crime has not been committed, for the severance denounced by the statute must be a part of the body of a human being. (Pen. Code, § 203.)

The record shows that after Orcalles met Padilla and Gundran outside of the Old Jap Church, he stabbed Padilla numerous times and then stabbed Gundran twice. Gundran ran away, chased by Orcalles, who tripped during the chase. While he was down, one of the witnesses took his knife away from him. Orcalles then got up, returned to where Padilla was lying on the ground, took another knife from his pocket and proceeded to stab Padilla again, cut off his ears, part of his nose and ripped him from his stomach to his throat. There was evidence that Padilla was still alive at the time that his ears and nose were slit for "his stomach was moving and he was breathing" and afterwards "there was a lot of blood in the vicinity of his nose and ear." After these acts of mayhem Orcalles poured beer on Padilla's body.

Certainly if, while Padilla was still alive, but after the mortal wound had been inflicted, Orcalles had committed acts amounting to torture, the crime would amount to first degree murder. The defendant's act need not be the sole cause of the death, provided it is a proximate cause. (*People v. Lewis*, 124 Cal. 551 [57 P. 470].) So here, if the first mortal wound had been inflicted by another person and Orcalles, afterwards coming upon the victim while he was still alive, had cut off his ears and nose and slit him from his stomach to his throat, he would have committed a homicide, which by its nature would amount to first degree murder even though he merely accelerated a death which was bound to occur without his interference. (*People v. Ah Fat*, 48 Cal. 61.) The crime cannot be any the less heinous because Orcalles inflicted the first mortal wound.

Only two cases have been discovered in which there was evidence that the defendant had caused two injuries, both of which were probably fatal. Both decisions rely on the later acts as being sufficient to support the verdict of guilty. In the first of these, *Jackson* v. *Commonwealth,* 100 Ky. 239 [38 S.W. 422, 1091, 66 Am.St.Rep. 336] the evidence showed that the defendant had administered poison to a woman in Ohio. The poison was in sufficient quantity to cause death eventually. Defendant then took her into Kentucky, and there, while she was still alive, but thought by the defendant to be dead, he cut off her head. Upon rehearing, after affirmance of the conviction, the defendant argued that he was punish-.able neither in Ohio nor in Kentucky. His argument was that the Ohio courts were without jurisdiction to punish him for murder, for the attempt there was not successful; the Kentucky courts were without jurisdiction to impose punishment for murder because the act done in that state, which accomplished and completed the actual killing, was done upon the supposition that the murder had already been accomplished, so there was no intent to kill when the woman was decapitated. The court, in deciding that Kentucky had jurisdiction to punish him for murder, said: "We see no good reason why we should not consider the motive which inspired an attempted crime in another sovereignty, and the circumstances of the attempt, with the view to determine the character, criminal or not, of the ultimate fact which took place in this sovereignty." (P. 1092 [38 S.W.].)

A case more closely analogous to that presented by the facts of the present record was recently decided by the Supreme Court of Nevada. (*State* v. *Sala,* 63 Nev. 270 [169 P.2d 524].) The defendant Sala and Edward McCollum were driving through Nevada in the automobile of McCollum. Sala testified that McCollum made improper advances to him, which he resisted. He then fell asleep and when he awakened, the car had stopped. McCollum was standing on Sala's side of the car and was making advances again. Sala told the deceased to get away, and when he did not do so, Sala started to get out of the car. As he did so he grabbed a ball peen hammer which was in the open glove compartment and hit McCollum across the face with the head of it. Sala hit him several more times with his fists and the hammer, until McCollum fell down. There was evidence that these injuries were sufficient to cause death. Sala then dragged McCollum over

to the side of the road, and started to get into the car, intending to drive it to Salt Lake City. He noticed, however, that McCollum got up and started coming toward him. Sala reached into the glove compartment again, found a monkey wrench, and hit McCollum in the face and on the head several more times. McCollum fell down, and Sala drove away in the car.

Sala was convicted of first degree murder. Upon appeal he contended that both the first and second beatings were continuous and were due entirely to uncontrollable passion aroused in him by improper advances of McCollum toward him; that there was a lack of intention to kill McCollum; and that if the death resulted from the beatings, the killing was not wilful and premeditated, and at most, was second degree murder. The court held, however, that the second beating occurred to overcome or present resistance to the taking of the car, and that "all the elements of a malicious and intentional killing of the deceased by the appellant, in the perpetration of robbery, were proven." (P. 534 [169 P.2d].)

In reaching its decision the Nevada court reasoned: "As to the element of the cause of death, it was sufficient if, from the evidence, it was proven that the injuries inflicted by the second series of beatings were of such nature that, in their natural and probable consequence, they would produce death, or at least materially contribute to and accelerate same.

"As stated in 26 Am.Jur., sec. 49, p. 192:

" 'The law declares that one who inflicts an injury on another and thereby accelerates his death shall be held criminally responsible therefor. It is said in this connection that if any life at all is left in a human body, even the least spark, the extinguishment of it is as much homicide as the killing of the most vital being.' " (*State* v. *Sala, supra,* p. 533-534 [169 P.2d].)

Just as in the Sala case, the second set of injuries here contributed materially to cause and probably accelerated the death of Padilla, and there is sufficient evidence to justify a verdict of murder in the first degree because committed in perpetration of mayhem. "[W]here there is substantial evidence in support of the jury's verdict, its determination must be upheld. (Citing cases.) Conversely, to justify the reversal of a judgment of conviction, the record must clearly show that the evidence could not be interpreted as supporting

the verdict." (*People* v. *Eggers, supra*, p. 685; cf., *People* v. *Sanchez*, 30 Cal.2d 560, 570 [184 P.2d 673].)

Orcalles argues for the abolition of this rule and contends that he need not show the denial of a fair trial on both theories of the prosecution in order to justify a reversal. In support of this proposition he cites *Stromberg* v. *California*, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117], and *Haupt* v. *United States*, 330 U.S. 631 [67 S.Ct. 874, 91 L.Ed. 1145]. These decisions, however, are not here controlling. In the Stromberg case the defendant had been convicted under a statute denouncing three different types of conduct separately stated. The jury returned a general verdict of guilty without specifying the particular act upon which it was based. The judgment was reversed because the court found that the statute, in making one of the three types of conduct unlawful, was unconstitutional, and it could not be determined under which clause defendant had been convicted. The language relied upon by appellant in the Haupt case appears in a footnote appended to the statement of the court that it does "not reach the question whether the conviction could stand on some sufficiently proven acts, if others failed in proof." (Pp. 640-641.)

Moreover, for all that appears in the record, the intention to kill Padilla may have been coupled with the intention to cut off his nose and ears, or to kill him by means of cutting off these members of the body. I see no basis for limiting the inferences which legitimately might have been drawn by the jury from the testimony to the sole intention to kill Padilla by stabbing him. The fact that Padilla received wounds which would and did cause his death about 15 minutes after his nose and ears were cut off does not, of itself, excuse Orcalles from the consequences of a murder committed in the commission of mayhem.

For these reasons, I would affirm the judgment.

Shenk, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied September 30, 1948. Shenk, J., Edmonds, J., and Spence, J., voted for a rehearing.