[Crim. No. 19532. Mar. 14, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL WAYNE HENDERSON et al., Defendants and Appellants.

### COUNSEL

Fred E. Corbin and Larrie R. Brainard, under appointments by the Supreme Court, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, M. Howard Wayne, Jay M. Bloom and Michael E. Lasater, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**SULLIVAN, J.**\*—Defendants Carl Wayne Henderson and Herbert Jeffrey Hawthorne were charged by information with murder (Pen.

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Code, § 187) (count one),[1] kidnaping (§ 207) (count two), and false imprisonment (§§ 236, 237) (count three). Henderson was also charged with assault with a deadly weapon (§ 245, subd. (a)) (count four). It was also charged that Henderson used a firearm (§ 12022.5) and that Hawthorne was armed with a deadly weapon (§ 12022) in the commission of each of the offenses with which they were charged. A jury found defendants guilty of murder of the second degree and false imprisonment, but acquitted them of kidnaping. Defendant Henderson was also found guilty of assault with a deadly weapon. The jury found that Henderson used a firearm[2] and Hawthorne was armed with a deadly weapon in the commission of the offenses of which they were convicted. Henderson was sentenced to state prison for the term prescribed by law and Hawthorne was granted probation. They appeal from the judgments of conviction.[3]

We must determine whether the trial court erred in instructing the jury on the theory of second degree felony murder. We conclude on the basis of settled principles that the offense of false imprisonment as proscribed by sections 236 and 237 is not a felony inherently dangerous to human life in the abstract and, therefore, not capable of supporting a second degree felony-murder instruction. The trial court erred in giving such an instruction and the error was prejudicial. We reverse the judgments insofar as they convict defendants of second degree murder.

Early in the evening of October 13, 1974, defendants were visited by Jim Reinesto who attempted to sell them certain articles of personal

---

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2]The record is somewhat confused in respect to the application of section 12022.5 to defendant Henderson's conviction of false imprisonment. The jury returned a verdict finding that Henderson "did use a firearm in the commission of the crime of false imprisonment in violation of Penal Code section 12022.5 as charged in Count Three of the Amended Information." At the time of pronouncement of judgment against Henderson, the prosecutor informed the court that section 12022.5 did not apply to the crime of false imprisonment. The court thereupon ordered the use finding stricken. The abstract of judgment is consistent with the foregoing in that it contains no reference to any finding by the court that Henderson used a firearm in his commission of false imprisonment. Nevertheless, the abstract indicates that the jury convicted Henderson of "False Imprisonment While Armed (Penal Code Sections 236/237 & 12022.5)." In view of the trial court's action in striking the use finding as to count three and to avoid possible further confusion, the above reference to being armed and to section 12022.5 in connection with count three (false imprisonment) should be deleted from the abstract of judgment.

[3]Each defendant also purports to appeal from the order denying his motion for a new trial. Such order being nonappealable (§ 1237; *People* v. *Haston* (1968) 69 Cal.2d 233, 237, fn. 3 [70 Cal.Rptr. 419, 444 P.2d 91]), the attempted appeals therefrom must be dismissed.

property. Defendants refused to buy the items and Reinesto departed. Returning home from a party around midnight, defendants discovered that Henderson's color television set was missing. They suspected that Reinesto had taken it and determined to find him and recover the property. Henderson carried Hawthorne's shotgun.

Defendants went in Hawthorne's car to a residence where Reinesto had been seen but failed to find him there. Henderson borrowed a pistol from an occupant of the house. He testified that he removed the clip from the gun, believing that he had thereby unloaded it, and then put the gun in the waistband of his pants.

Defendants then drove to another house where they had earlier seen Reinesto's car parked. They entered the house unannounced and found Reinesto sitting in a chair. Hawthorne held a club and stood near the door. Henderson pointed the pistol at Reinesto and demanded return of the television set. There was testimony that Henderson threatened to take Reinesto to a canyon and kill him if he did not return the television. After Henderson's repeated demands for the set and Reinesto's continuous denials that he had taken it, the latter suggested that they should all go to the home of Mr. and Mrs. Gilhooley who would confirm that Reinesto had been with them during the evening and that he had not taken the television.

At this point Henderson said either "Let's go" or "Let's go to the canyon." Reinesto got up from his chair and walked out to Hawthorne's car thinking that Henderson was directly behind him. Instead Hawthorne walked along side carrying the club and Henderson followed a short time later. Henderson sat in the rear seat and ordered Reinesto to sit in the front passenger seat. Hawthorne drove. During the ride, Henderson placed the barrel of the shotgun at the back of Reinesto's neck and threatened to take him to the canyon. Hawthorne drove in the direction of the canyon but after some urging by Reinesto and upon Henderson's order finally drove to the Gilhooleys' house.

Upon arrival, Reinesto walked to the front door, followed by Henderson with the pistol in his waistband and by Hawthorne carrying the club. Mr. and Mrs. Gilhooley came out onto their front porch. Henderson pulled the pistol out of his waistband and pressed the barrel against the back of Reinesto's neck. Defendants then told the Gilhooleys that they were there to determine if Reinesto had stolen Henderson's

television and sold it. Mr. and Mrs. Gilhooley confirmed Reinesto's claim that he had been with them most of the evening.

Henderson apparently disbelieving the Gilhooleys, again threatened to take Reinesto to the canyon and kill him. He ordered Reinesto "Come on, let's go," and according to the latter pushed him with the gun. At that moment, Reinesto ducked, twisted to the left and threw up his arm in an attempt to move the gun away from his head. The weapon discharged and a bullet struck Mrs. Gilhooley in the chest. Henderson immediately took flight while Hawthorne attempted to assist the victim who died shortly thereafter. Hawthorne told Reinesto that Henderson and he had not intended to shoot him but had only been trying to scare him into returning the television.

Instructing on both murder and involuntary manslaughter, the trial court told the jury that if their verdict was murder, it was murder of the second degree. The court instructed on two theories of second degree murder: a killing directly resulting from an act involving a high degree of probability of death (CALJIC No. 8.31 (3d ed. 1974 pocket pt.) and second degree felony murder (CALJIC No. 8.32 (3d ed. 1970)).[4] The court also instructed on the elements of false imprisonment and specifically instructed that "[w]hen a false imprisonment is effected by violence, menace, fraud or deceit, it is a felony. Otherwise it is a misdemeanor." Defendants objected to the inclusion of false imprisonment as a felony upon which a murder conviction could be based under the second degree felony-murder rule.

We see no necessity in the instant case to review in detail the history of, and the decisions of this court explaining, the second degree felony-murder doctrine which we discussed but a few years ago in *People v. Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]. We need only briefly restate the fundamental principles and apply them to this case. ■ In doing so, however, we are aware that the felony-murder rule is disfavored because it relieves the prosecution of the burden of proving one element of murder, malice aforethought. We repeat our belief that the " 'highly artificial concept'

---

[4]That instruction, as given, states: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely the crimes of either kidnaping or *felony false imprisonment,* and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree." (Italics added.)

(*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]) of strict criminal liability incorporate in the felony-murder doctrine [should] be given the narrowest possible application consistent with its ostensible purpose—which is to deter those engaged in felonies from killing negligently or accidentally (see *People* v. *Washington* [1965] 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130], and authorities there cited)." (*People* v. *Satchell, supra,* 6 Cal.3d 28, 34.)

 In accord with the aforementioned purpose, we have held that application of the second degree felony-murder doctrine can be supported only by those felonies which are "inherently dangerous to human life." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) "If the felony is not inherently dangerous it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 4 [47 Cal.Rptr. 7, 406 P.2d 647].) Moreover, "we look to the elements of the felony in the abstract, not the particular 'facts' of the case," in determining whether the felony involves an inherent danger to human life. (*Id.,* at p. 458, fn. 5; *People* v. *Phillips, supra,* 64 Cal.2d 574, 582.) Thus, our task in the instant case is to determine whether the offense of felony false imprisonment, as defined in part by Penal Code section 236 and proscribed by Penal Code section 237, when considered in the abstract, is inherently dangerous to human life.

As defined in section 236, "False imprisonment is the unlawful violation of the personal liberty of another." Without more, the conduct described in section 236 is a misdemeanor offense. (§ 237.) If effectuated by "violence, menace, fraud or deceit," false imprisonment is elevated to a felony. (§ 237.)[5]

In determining whether the offense of felony false imprisonment is inherently dangerous to human life, we proceed through a two-step analysis. First, we conclude that the primary element of the offense, namely the unlawful restraint of another's liberty, does not necessarily involve the requisite danger to human life. The aspect of confinement is not life threatening. It has been said that "[a]ll that is necessary to make

---

[5]Section 237 provides in whole as follows: "False imprisonment is punishable by fine not exceeding five hundred dollars, or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison for not less than one nor more than ten years."

out a charge of false imprisonment is that the individual be restrained of his liberty without any sufficient complaint or authority therefor . . . . Temporary detention is sufficient, and the use of actual physical force is not necessary." (*Ware* v. *Dunn* (1947) 80 Cal.App.2d 936, 943 [183 P.2d 128].) The unlawful conduct by which the confinement is accomplished also does not necessarily involve a hazard to the victim's life. " 'The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both. . .' " (*People* v. *Agnew* (1940) 16 Cal.2d 655, 660 [107 P.2d 601].) The conduct may involve merely the simple act of announcing without probable cause the making of a citizen's arrest, the natural consequence of which is to cause the police to take the victim into custody. (*Id.,* at pp. 659-660.)

Second, we consider whether the factors elevating the offense to a felony render false imprisonment inherently dangerous to human life. It is manifest that the four factors of violence, menace, fraud, or deceit do not all involve conduct which is life endangering. Quite obviously fraud or deceit portend no such danger; certainly one who commits felony false imprisonment by means of fraud or deceit presents no danger significantly greater than one who commits misdemeanor false imprisonment so as to justify imputing malice to the former but not to the latter should a homicide result. (Cf. *People* v. *Satchell, supra,* 6 Cal.3d 28, 40 [a felon armed with a concealed weapon presents no danger significantly greater than a nonfelon similarly armed so as to impute malice to the former].) While the elements of violence or menace by which false imprisonment is elevated to a felony may involve danger to human life, the felony offense viewed as a whole in the abstract is not inherently dangerous to human life. Thus, felony false imprisonment is similar to those general offenses embracing a variety of conduct both violent and nonviolent which we have held not to be inherently dangerous to human life. For example, in *People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372], we considered the crime of escape proscribed by section 4532. As we said in *Lopez,* the methods included within the offense of escape range from "those involving force or violence to tardiness on the part of one engaged in a work furlough program." (*Id.,* at p. 51.) We were unable to "conclude that those who commit nonviolent escapes . . . thereby perpetrate an offense which should logically serve as the basis for the imputation of malice aforethought in a murder prosecution. Because section 4532 draws no relevant distinction between such escapes and the more violent variety, it proscribes an offense which considered in

the abstract, is not *inherently* dangerous to human life . . . ." (*Id.,* at pp. 51-52.)

■ The People contend that the offense of felony false imprisonment should not be analyzed as a whole, but that the court should first determine which type of felony false imprisonment is involved in the particular case. It is argued that false imprisonment by violence or menace is an inherently dangerous felony capable of supporting a second degree felony-murder instruction.

We reject this approach. The Attorney General's argument supposes a legislative intent that the second sentence of section 237 (see fn. 5, *ante*) proscribes not one, but four separate felonies depending upon the means by which false imprisonment is effected. Reading and considering the statute as a whole in order to determine the true legislative intent (*People* v. *Moroney* (1944) 24 Cal.2d 638, 642 [150 P.2d 888]), we find no basis for severing false imprisonment by violence or menace from the offense of felony false imprisonment. The Legislature has not drawn any relevant distinctions between violence, menace, fraud, or deceit. These types of conduct are specified only as a basis for distinguishing between false imprisonment punishable as a misdemeanor and false imprisonment punishable as a felony. Most significantly, the Legislature has not distinguished between false imprisonment effected by violence or menace on the one hand and false imprisonment effected by nonviolent methods of fraud or deceit on the other. The Legislature has not evinced a particular concern for violent as opposed to nonviolent acts of false imprisonment by separate statutory treatment, proscription, or punishment. Accordingly, we cannot conclude that the cause of deterring homicide during the commission of false imprisonment is better served by imputing malice to one who kills in the course of committing false imprisonment rather than allowing the jury to determine directly the question of the presence of malice aforethought.

Notwithstanding the lack of support, either in the statute itself or in the purposes of the second degree felony-murder doctrine, for severing false imprisonment by violence or menace from the offense of felony false imprisonment, the People assert that this is precisely the position taken by this court on analogous facts in *People* v. *Nichols* (1970) 3 Cal.3d 150, 162-163 [89 Cal.Rptr. 721, 474 P.2d 673]. The People exaggerate our decision in *Nichols.* We were directly concerned in *Nichols* with the important question whether the burnings proscribed in

section 449a constituted "arson" as that word is used in the first degree felony murder provisions of section 189. After an exhaustive analysis of the relevant legislative history, we concluded that they did not. Having decided that question, we were then faced with the proper disposition of the judgment convicting the defendant of first degree felony murder. The record disclosed that the jury had determined that the defendant had set fire to a motor vehicle and that the resulting fire had killed two children. We concluded that the burning of a motor vehicle "which usually contains gasoline and which is usually found in close proximity to people, is inherently dangerous to human life. We therefore conclude[d] that the wilful and malicious burning of a motor vehicle calls into play the second degree felony-murder rule," and modified the judgment accordingly. (*Id.,* at p. 163.) We did not *decide* whether section 449a, including as it does the proscription against a variety of burnings of personal property not all of which are dangerous to human life, is when considered in the abstract inherently dangerous to human life. The issue was not in fact raised and we therefore had no occasion to consider it. We are not disposed to decide questions not advanced by the parties. Nonetheless, any suggestion in *Nichols* inconsistent with the views expressed in this opinion should not be followed.

 We therefore conclude that in the case at bench the court erred in giving a second degree felony-murder instruction based upon defendants' commission of felony false imprisonment in violation of sections 236 and 237 of the Penal Code. We find the error prejudicial. After deliberating for two and one-half days, the jury requested a rereading of the felony-murder and manslaughter instructions; the court complied and at the same time gave a detailed explanation of those offenses. It appears, then, that the jury was particularly concerned with the application of the felony-murder doctrine in this case. Since the jury acquitted defendants of kidnaping, application of the felony-murder doctrine could have been based only on the offense of false imprisonment. As we have repeatedly stated in similar cases, an error in instructing the jury on the application of the felony-murder doctrine is prejudicial "because it relieved the jury of the necessity of finding malice aforethought in the circumstances." (*People* v. *Lopez, supra,* 6 Cal.3d 45, 52; *People* v. *Satchell, supra,* 6 Cal.3d 28, 41; *People* v. *Phillips, supra,* 64 Cal.2d 574, 584.)

Finally we respond to two subsidiary contentions not otherwise disposed of by our reversal of the murder convictions.

First, defendants contend that there is insufficient evidence to support their convictions of false imprisonment. We consider this argument in light of the established standard requiring us to view the evidence in a light most favorable to the verdict, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

The jury was entitled to conclude on the basis of the evidence that Reinesto was unlawfully restrained of his liberty on several instances and that Hawthorne aided and abetted in the restraint. The most obvious instance was when Henderson placed the pistol at the back of Reinesto's neck on the porch of the Gilhooley house. Reinesto testified that Henderson, while doing so, repeatedly threatened to shoot him. Reinesto's credibility was of course a question for the jury.

Contrary to their claim, defendants' acquittal of kidnaping indicates merely that the jury had a reasonable doubt as to whether Reinesto willingly accompanied defendants at the start. The jury could properly have concluded that he was subsequently restrained of his liberty in the car when Henderson placed the shotgun at the back of his neck as well as during the incident at the Gilhooley house. Although Hawthorne said little during these events, the fact that he obviously joined Henderson in an enterprise to find Reinesto and retrieve the television, that he drove the car while Henderson held a gun to Reinesto's head, that carrying a club he followed Reinesto and Henderson to the porch of the Gilhooley residence, and that he stood by with the club while Henderson threatened Reinesto with the pistol is sufficient evidence from which the jury could infer that Hawthorne aided and abetted in the commission of the offense.

Second, Henderson contends that it was error for the trial court to admit certain statements which he had made in jail to a psychotherapist, Dr. Griswold, shortly after his arrest, on the grounds that they were privileged (Evid. Code, § 1012) and were made involuntarily. The claim is devoid of merit.

Immediately prior to his interview with Dr. Griswold, Henderson was advised that he had a right to remain silent, that anything he said could be used against him and that he had the right to have his attorney present. He was then asked, "Having in mind and understanding your rights . . . are you willing to talk to Dr. Griswold?" He responded, "Yes, I

will." In addition, Dr. Griswold informed Henderson that the interview was being conducted at the request of the district attorney. Finally, the doctor testified that Henderson was pleasant, cooperative, alert and apparently willing to talk, that his speech was coherent, and that, contrary to Henderson's claim, his will did not seem affected by any medication.

These facts amply support the trial court's determination that Henderson's statements to Dr. Griswold were voluntarily made under circumstances devoid of the confidentiality fundamental to an assertion of the patient-psychotherapist privilege. We find no error. (*People* v. *Cooper* (1970) 10 Cal.App.3d 96, 108 [88 Cal.Rptr. 919].)

The attempted appeal of each defendant from the order denying his motion for a new trial is dismissed. As to defendant Henderson, the judgment is reversed as to count one and is in all other respects affirmed, except that the trial court is directed, as to count three only, to delete from the abstract of judgment the reference therein to being armed and the reference to Penal Code section 12022.5. As to defendant Hawthorne, the judgment is reversed as to count one and is in all other respects affirmed.

Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., and Wright, J.,* concurred.

Respondent's petition for a rehearing was denied April 13, 1977, and the opinion was modified to read as printed above.

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.