[Crim. No. 3009. Fifth Dist. Nov. 30, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL J. HOUTS, Defendant and Appellant.

## COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Gary S. Goodpaster, Chief Assistant State Public Defender, Richard E. Shapiro and Richard L. Phillips, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOPPER, J.**—This is an appeal from a second degree murder conviction in which the jury also found that the defendant was armed with a firearm (Pen. Code, § 12022; § 3024, subd. (a), repealed by Stats. 1976, ch. 1139, § 279.).

The facts are these: In November of 1975, Robert Sinor lived in the town of Friant, Fresno County. A man of 61 years old, he lived alone in a small cabin and was in poor physical condition. He drank heavily at times, had cirrhosis of the liver, severe emphysema of the lungs and severe coronary arteriosclerosis. He was 5 feet, 6 inches tall and weighed 140 pounds.

Appellant (Houts) was an 18-year-old high school student who began a camping trip in the Table Top Mountain area near Friant on November 16, 1975.

On Monday, November 17, 1975, Sinor stopped in at the Lost Lake Bait and Tackle Shop, owned and operated by his sister-in-law, Mattie Lee Sinor. Sinor purchased some lunch meat, cigarettes, a bottle of wine and some other items. When he paid for the items, Mattie Sinor noticed Robert Sinor had a lot of $10 and $20 bills in his wallet. He mentioned that he was going to pay cash for a washing machine the next day.

At the time Robert Sinor arrived at the store, Houts was also there and had been looking around the store. Houts made a small purchase and told Mattie Sinor he wanted to make a telephone call to Fresno. Houts

appeared to Mattie like he was "on dope" because his eyes looked funny and because of his general demeanor. Another customer of the store, Laurie Sparks, agreed, stating that Houts had "freaky looking eyes."

Sometime later on the same day (Monday, Nov. 17), Houts and Sinor went together to the Friant Trading Post. When they approached the check stand, the victim introduced Houts as his nephew. Marilyn Norman, the cashier at the store, had known Sinor for five years, but had never seen Houts or any other young man with him before. Sinor bought some beer, which was presumed to be for Houts, since it was known that Sinor only drank wine.

Later that day, Houts and Sinor went to Sinor's cabin where they shot some bottles with Sinor's shotgun and pistol. Houts had a headache and took a Dalmine pill shortly after his arrival. They then sat around the table talking while Sinor drank wine and Houts drank beer. A couple of times during the talk Sinor had touched Houts' legs with his hands, but it had seemed like a friendly gesture. Eventually Houts went to sleep in his sleeping bag which he had laid on the floor of the room adjacent to the kitchen.

The following day, Tuesday, November 18, 1975, Sinor returned briefly to the Friant Trading Post about 9 a.m. and bought a small bottle of wine.

Houts also testified as follows: When he awoke on November 18, 1975, it was already light. He wasn't sure if it was morning or afternoon and he felt mixed up and run down. He had a headache and believes he took Dalmine for it. From his position in the sleeping bag he could see Sinor sitting at the same spot at the table. Houts again sat at the table and Sinor kept putting his hands on Houts' legs. (According to other testimony, later in the day, around noon, Sinor went alone to a local tavern owned by Leroy Plaskett. Sinor stayed there about 45 minutes and bought a drink for Plaskett and another patron. As he paid for the drinks, Plaskett noticed that Sinor's wallet was loaded with money.)

Houts began packing his backpack with the intention of leaving, but Sinor returned just as he finished packing. Sinor now seemed very drunk. This was substantiated by the fact that Sinor's blood contained .24 percent alcohol at the time of his death. Sinor began telling Houts how lonely he was and putting his hands on Houts' legs. He stated that he had not had a woman in a long time and that he had been eating laxatives to clean out his system. He also stated that he wanted Houts to "butt fuck"

him. Houts had been pushing Sinor's hands away. Houts got up and declared, "I ain't going to do that stuff." Sinor jumped up and grabbed him by the throat so tightly that Houts could not breathe. Houts grabbed a bottle and hit Sinor over the head, shattering the bottle. Sinor continued choking him, so Houts grabbed a relish bottle and hit Sinor on the head again. This bottle also broke and it cut Houts' hand. Houts thought he might die. His hand came in contact with Sinor's handgun which was lying on the kitchen counter and he brought the gun up and shot Sinor. Sinor continued choking, and Houts thinks he pulled the trigger again, but the gun would not fire.

Houts then wrote a note on an envelope which he placed on the table. On the envelope was written "the old man tried to rape me and stab me. I thought you would blame me so I left." After he began writing, he thought of obtaining Sinor's identification. He went through Sinor's pockets, removed some identification and left the wallet and the papers on the table.

Just prior to leaving, he decided to take an undetermined amount of money. He also took the gun "for the purpose of getting rid of it." Houts hitchhiked back to Fresno where he arrived home prior to 5:30 in the evening.

Other evidence established the following: The next morning (Wednesday, Nov. 19, 1975), Roger Sinor observed that Robert Sinor had not come to get his dog, so he tried to call Robert. Roger and his wife then went to check on Robert. After reaching Robert's residence, Roger entered and found Robert's body on the floor. There was broken glass on the floor and it appeared as though a struggle had taken place. Roger also observed that Robert's pants had been pulled down about six or eight inches, although his underwear had not been pulled down.

After police investigators arrived on the scene, it was determined that there were two partially consumed bottles of wine. The victim's wallet was out of his pocket and had been gone through. The victim's pockets had been turned inside out. The victim had a deep laceration on the top of his scalp which penetrated to the skull. The neck of a broken wine bottle found near the body yielded fingerprints which matched Houts'. Footprints on the floor of the cabin appeared to have been made by some "waffle-stomper" shoes owned by Houts.

An autopsy of the victim indicated there were small glass fragments near the scalp wound. There was also a gunshot wound in the victim's lower left side in the kidney area which had been made by a .25-caliber weapon. In addition, the victim had been strangled, both manually and with a length of cord. There were other abrasions about the face of the victim. The strangulation had taken place after the victim was either in deep shock or actually dead. There were also some abrasions on the victim's right hip which had been made before he died. At the time of his death, the victim's blood contained .24 percent alcohol.

Houts admitted at trial that he killed Sinor. However, as pointed out hereinbefore, he claimed that Sinor had wanted Houts to sodomize him and that when Houts refused, Sinor attacked and started choking Houts. Houts then allegedly hit the victim over the head with a relish jar and a wine bottle, shot him with a .25-caliber handgun which he found in the cabin, and strangled him manually and with a length of cord in self-defense.

Houts was charged with first degree murder (with an allegation of use of a firearm in the commission of a murder). The prosecution argued at trial that the evidence established first degree felony murder (robbery). The jury was instructed on first degree felony murder and was also instructed on second degree felony murder (attempted sodomy) and on second degree murder other than felony murder. On this appeal Houts contends, inter alia, that the trial court erred in instructing the jury that malice could be implied if Sinor's death was a direct result of the commission of or an attempt to commit the crime of sodomy.

The prosecution tried this case on several theories, argued each of those theories and requested instructions on each of those theories. The court gave the requested instructions. One theory was first degree felony murder with robbery as the felony. That theory was rejected by the jury. The jury did find the defendant guilty of second degree murder. Two theories of second degree murder were presented to the jury. One was a theory of second degree felony-murder rule which substituted attempted sodomy for malice, and the second theory was one requiring proof of malice.

The trial court gave CALJIC instructions Nos. 8.31, 8.32 and 10.50, as modified.[1]

---

[1]CALJIC No. 8.31 states: "Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability

██ Houts contends that CALJIC No. 8.31 (and the related instructions) should not have been given because there was no evidence of sodomy or attempted sodomy and that sodomy is not a felony inherently dangerous to human life in the abstract.

Respondent argues that the doctrine of invited error applies in that at least CALJIC No. 8.32 was invited by defense counsel, and that even if Houts' contention were cognizable on appeal, any error in instructing the jury on second degree felony murder was harmless.[2]

The position of respondent on invited error is basically as follows: Defense counsel failed to object to instructions characterizing sodomy as an inherently dangerous felony for purposes of second degree felony murder. This failure was due to a tactical decision as is shown by a proposed defense instruction.[3] Houts made this choice of tactics in furtherance of his theory of defense. Therefore, he cannot now complain that sodomy is not an inherently dangerous felony.

We are not persuaded by respondent's analysis. Even if we agreed with that position, it would only preclude Houts from now raising the objection to the characterization and would still leave remaining the contention of error in giving the second degree felony-murder instructions.

___

that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

CALJIC No. 8.32 states: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of sodomy, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. [¶] The specific intent to commit sodomy and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt."

CALJIC No. 10.50, as modified, states: "The felony crime of sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person."

[2]At oral argument, the Attorney General conceded that sodomy is not an inherently dangerous felony in the abstract.

[3]The special instruction requested by defense counsel states: "Homicide is justifiable and not unlawful when committed by any person when resisting any attempt to murder any person, or to commit a felony inherently dangerous to human life [such as assault by means of force likely to do great bodily injury or sodomy], or to do some great bodily injury upon any person."

We hold that it was error in this case to give instructions on the second degree felony-murder rule. No substantial evidence exists in the record to support an instruction on sodomy or attempted sodomy by Houts.

The evidence on attempted sodomy consists in its entirety of the following:

(1) The victim's outer pants were down six or seven inches. On the other hand, the victim's underwear was intact and were where they normally would be.

(2) Houts testified that the victim was trying to get him (Houts) to sodomize the victim, from which it could possibly be inferred that there was an attempted sodomy.

This evidence was clearly insufficient to support the verdict on a felony-murder theory. However, it is *some* evidence on which the jury could have tried to apply the felony-murder instruction to reach their verdict.

If the second degree felony-murder theory was the sole basis for the verdict, we would be required under the law to reverse the conviction. Substantial evidence to support a verdict must be of solid value and must consist of more than a mere possibility that something happened; such solid evidence as to attempted sodomy is not present in this case.

■ Under the decisions of the California Supreme Court reversal is required when it is impossible to determine whether the verdict was based on admissible evidence submitted under proper instructions or on erroneous determination of questions improperly submitted to the jury. (*People* v. *Robinson* (1964) 61 Cal.2d 373, 406 [38 Cal.Rptr. 890, 392 P.2d 970].) This rule has been applied throughout the years in cases involving the felony-murder doctrine. (See *People* v. *Henderson* (1977) 19 Cal.3d 86, 96 [137 Cal.Rptr. 1, 560 P.2d 1180]; *People* v. *Cantrell* (1973) 8 Cal.3d 672, 686 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 52 [98 Cal.Rptr. 44, 489 P.2d 1372]; *People* v. *Satchell* (1971) 6 Cal.3d 28, 41 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Phillips* (1966) 64 Cal.2d 574, 584-585 [51 Cal.Rptr. 225, 414 P.2d 353].)

"[I]f on the record it appears beyond a reasonable doubt that the jury based its verdict on the theory supported by 'admissible evidence submitted under correct instructions'—there is no miscarriage of justice and the judgment must be affirmed pursuant to article VI, section 13, of the Constitution." (*People* v. *Cantrell, supra,* at p. 686.)

Respondent argues, in effect, that reversal is not required where the evidence is overwhelming (as respondent asserts exists in the instant case) on the theory submitted under correct instructions. While there is some arguable support for respondent's position in *People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43], there is no other authority which has been called to our attention intimating that the rule is that asserted by respondent. (Cf. *People* v. *Henderson, supra,* and cases cited therein.) Furthermore, we interpret the statement quoted by respondent from *Anderson* at page 360 that "Moreover, the evidence bearing on the prosecution's other theories supporting murder in the first degree was not strong enough for us to say that as a result of the erroneous instructions the 'defendant suffered no prejudice' " to mean, not that the evidence of guilt was not strong enough to convict, but that there was not strong enough evidence to convince the reviewing court beyond a reasonable doubt that the jury reached its verdict under the theory submitted to it under the correct instructions. We agree with respondent's contention that the evidence of second degree murder other than felony murder is overwhelming and that the evidence of attempted sodomy required much more inference on the jury's part. From that, however, we cannot reach the conclusion asserted by respondent that there can be little doubt which theory was relied upon by the jury in arriving at their verdict. To agree that such is the rule would substitute an entirely different rule, namely one of substantial or overwhelming evidence, in place of the present rule which requires proof beyond a reasonable doubt as to which theory was relied upon by the jury in arriving at their verdict. If there is substantial evidence to support conviction on both theories, the instruction would be proper. (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 207 [132 Cal.Rptr. 265].) As previously stated, there was not substantial evidence here to support conviction on the felony-murder theory.

We emphasize that we are not expressing a conclusion on guilt or innocence. That matter is and was for the jury to determine under proper instructions. Nor are we in any way criticizing the excellent and full investigation conducted by law enforcement in this case. As a reviewing court, we simply are unable to determine under what theory the verdict was reached. If made under the felony-murder rule, the verdict cannot stand. If made under the other theory in this case, the verdict was proper. Unfortunately, we are unable to determine what theory was followed by the jury and we are required to reverse.

We suggest that, conceptually, there are several possible means in a given case by which there might be sufficient proof to establish that a jury reached a verdict under the proper, rather than the improper, instructions.[4] None of them apply to the instant case. We illustrate (without purporting to exhaust the possibilities):

(1) where there is *no* credible evidence *whatsoever* to support the inapplicable instruction;

(2) the rare case where the jury specifically states on the record in some manner that it desires rereading of instructions without reference to the inapplicable instructions because it has already unanimously rejected the applicability of the inapplicable instructions;

(3) where (by some form of special verdict or otherwise) the jury tells the court, at the time the verdict is announced, the basis of the verdict; or

(4) where the inapplicable instruction relates to a situation which does not truly go to the corpus delicti of the crime charged. This was essentially the situation in *Cantrell,* relied upon by respondent. Unlike *Cantrell* (which in one sense is the opposite of the instant case), the error here did go to an essential element (malice), and in addition, the added error here was giving and arguing the felony-murder rule which did not require malice. In *Cantrell,* if the jury disbelieved the psychiatrist's testimony, the alleged error was immaterial, whereas, if the jury did believe that psychiatric testimony which went to the defendant's ability to harbor malice, judgment still had to be affirmed under the felony-murder rule which has no requirement of malice. Thus, in *Cantrell,* the error on the subject of diminished capacity could not possibly have affected the jury's verdict.

Here we cannot hold that the error did not affect the verdict because we simply have no way of telling, and we cannot usurp the fact-finding function of the jury.

If the prosecution had elected to proceed only on the theory of second degree murder other than felony murder, we would have no hesitation in concluding that a verdict of guilty would be clearly supported by the evidence. This court is not (nor under the doctrine of separation of

---

[4]We do not include situations where the rule is inapplicable such as where the felony-murder theory is not argued or where any reference to that theory, although error, is so incomplete or fragmentary that it is insignificant.

powers should it be) privy to the reasons for the prosecutorial decision which, from hindsight, appears unnecessary and which, under the evidence presented and the law, now results in another trial. However, once that prosecutorial choice was made and the error exacerbated by the inapplicable and improper instructions to the jury, we are compelled under the rules laid down by our Supreme Court to reverse.

The lesson to be learned is that the prosecutor should not proceed on an alternative theory of criminal responsibility for murder requiring instructions which may be relied upon by the jury, enabling it to be misled into substituting commission of a felony for the element of malice where the evidence is simply insufficient to establish that particular alternative. The use of a well aimed and finely honed blade, rather than the scattergun with its dangerous spray effect, is often the most effective method of assuring a successful and final victory. Here it appears that proceeding on the felony-murder theory was unnecessary and resulted in reversible error. Unfortunately, the record is very clear that the prosecutor vigorously argued to the jury on the felony-murder theory and the jury was instructed on that theory. "However reprehensible the conduct of an accused, he is entitled to have its legal consequences determined from competent evidence by a jury properly instructed." (*People* v. *Orcalles* (1948) 32 Cal.2d 562, 573 [197 P.2d 26].) We are not permitted under the rules laid down by our Supreme Court to speculate on how the jury reached its verdict, particularly in situations where a jury is given a theory (in this case based on the felony-murder rule) unsupported by substantial evidence which gives an opportunity to the jury to short-circuit a determination of the complex concept of express or implied malice—an essential element of second degree murder other than felony murder. One of the reasons given by the Supreme Court in the cases for narrowly applying the felony-murder rule and why it is prejudicial is because it does relieve the jury of the necessity of finding malice. (*People* v. *Henderson, supra,* 19 Cal.3d 86, 96; *People* v. *Lopez, supra,* 6 Cal.3d 45, 52; *People* v. *Satchell, supra,* 6 Cal.3d 28, 41; *People* v. *Phillips, supra,* 64 Cal.2d 574, 584.)

To recapitulate, erroneously instructing on felony murder in this case gave the opportunity to the jury to bypass the finding of malice. We simply cannot tell, therefore, upon which theory the verdict was based, and we are required under the law to reverse the conviction.

In view of our disposition herein, it is unnecessary to reach Houts' other contentions because the issues raised therein should not appear in his retrial.

The judgment is reversed.

Brown (G. A.), P. J., and Accurso, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.